248 P.3d 234

**In the Interest of TW.**

**No. 30387.**

Intermediate Court of Appeals of Hawaiʻi.

Jan. 31, 2011.

As Corrected March 2, 2011.

Randal I. Shintani, for Mother–Appellant.

Deirdre Marie–Iha, Deputy Solicitor General (Mary Anne Magnier (Deputy Attorney General) with her on the brief), Department of the Attorney, for Petitioner–Appellee.

NAKAMURA, Chief Judge, FOLEY, and FUJISE, JJ.

Opinion of the Court by NAKAMURA, C.J.

This appeal involves the decision of the Family Court of the First Circuit (family court) [1] to divest Mother–Appellant (Mother) of her parental rights over her child, TW, (Child) and award permanent custody of Child to the Department of Human Services (DHS). Mother appeared as required at all family court proceedings starting from the initiation of the case and for the ensuing eighteen months. She then failed to appear at a scheduled court hearing. Based on Mother's single nonappearance, the family court found Mother to be in default, granted the DHS's motion for permanent custody, and divested Mother of her parental rights over Child. The family court also denied Mother's subsequent motion to set aside the default.

"[P]arents have a fundamental liberty interest in the care, custody, and management of their children[,]" and "parental rights cannot be denied without an opportunity for [parents] to be heard at a *meaningful time and in a meaningful manner.*" *In re Doe*, 99 Hawai'i 522, 533, 57 P.3d 447, 458 (2002) (internal quotation marks and citations omitted; emphasis in original). The family court's entry of default against Mother divested Mother of her parental rights and awarded permanent custody of Child to the DHS without affording Mother an opportunity to challenge the DHS's motion for permanent custody on the merits. We conclude, under the circumstances of this case, that the

1. The Honorable R. Mark Browning presided over the proceedings relevant to this appeal.

family court abused its discretion in entering default against Mother.

## I. BACKGROUND

The family court proceedings in this case began with the filing by the DHS of a "Petition for Temporary Foster Custody" on May 14, 2008.[2] In this petition, the DHS alleged that Mother admitted leaving Child, who was eight months old, with a seventeen-year-old female from 2:00 p.m. on Fridays until 8:00 a.m. on Sundays, while Mother performed her community service on Saturdays.[3] The DHS had received a report concerning Mother's conduct on May 7, 2008, and determined that the seventeen-year-old "was not an appropriate caregiver for [Child]." On May 9, 2008, the police took Child into protective custody. Child was then released to the DHS and placed in a DHS emergency shelter.[4]

On May 16, 2008, Mother appeared with her counsel at a hearing on the Petition for Temporary Foster Custody. At the hearing, Mother contested the petition and requested a trial. The family court set the trial on the contested petition for May 23, 2008, and continued the DHS's temporary foster custody of Child.

On May 23, 2008, Mother and her counsel appeared at the trial on the DHS's Petition for Temporary Foster Custody. Mother introduced exhibits and called witnesses in support of her opposition to the petition. Following the conclusion of the trial, the family court entered an order granting the DHS foster custody over Child, finding that there was an adequate basis to sustain the petition and that Child's "physical or psychological health or welfare has been harmed or is subject to threatened harm by the acts or omissions of [Child's] family[.]" The family court also ordered the implementation of a family service plan (service plan) designed by the DHS[5] and that Mother appear for a review hearing on November 12, 2008.

Mother and her counsel appeared at the November 12, 2008, review hearing. The DHS recommended that foster custody and the service plan be continued, but it noted that "[M]other has been compliant with services and visits [with Child]." The family court ordered the continuation of foster custody and the service plan, and it scheduled a review hearing for March 19, 2009.

Mother appeared with her counsel at the March 19, 2009, review hearing, and Mother also appeared with her counsel at subsequent review hearings held on June 9, 2009, and November 17, 2009. The record reflects that during the period between the November 12, 2008 and the November 17, 2009, review hearings, Mother participated in services set forth in the applicable service plan and attended scheduled visitations with Child. The family court continued foster custody and the service plan during this period.[6] The record also reflects that during August and September 2009, Mother admit-

---

2. The Petition for Temporary Foster Custody was also filed against Child's father, whose name, address, and date of birth were listed in the petition as "unknown" and who was later identified in the proceedings only by his first name. Child's father, who was subsequently served by publication, did not appear at any of the proceedings in this case and was defaulted for failure to appear by the family court.

3. Mother was Child's natural and legal mother.

4. Prior to the instant case, Mother had been involved in DHS proceedings with regard to her three older children (Child's siblings). On April 24, 2008, the family court awarded the DHS permanent custody over Child's siblings, finding by clear and convincing evidence that Mother was not presently willing and able to, and will not become willing and able to, provide a safe family home for Child's siblings even with the assistance of a service plan within a reasonable period of time. The family court in this case took judicial notice of the cases relating to Child's siblings.

5. The May 14, 2008, service plan ordered by the family court contained the following "immediate tasks" and services for Mother to engage in or perform: (1) individual therapy; (2) hands-on parenting education/comprehensive counseling and support services; (3) enhanced healthy start; (4) comprehensive counseling and support services supportive counseling; (5) sign consents pertaining to Child's records and progress in therapy; and (6) cooperate with the DHS social worker.

6. At the March 19, 2009, review hearing, the family court ordered the implementation of a revised service plan dated March 16, 2009.

ted to using methamphetamine and tested positive for methamphetamine, and she was referred for substance abuse treatment.

At the November 17, 2009, review hearing, the DHS stated its intention to file a motion for permanent custody "within the next two weeks." The DHS also asked that foster custody be continued, and the DHS stated that it had obtained a December 22, 2009, hearing date and would "set it for review and [a] return." On November 19, 2009, the family court filed a written order continuing foster custody and requiring the parties to appear at a "review/MPC"[7] hearing on December 22, 2009.

On December 16, 2009, the DHS filed its "Motion for Order Awarding Permanent Custody and Establishing a Permanent Plan" (Permanent Custody Motion), pursuant to provisions of the Hawaiʻi Child Protective Act (CPA), Hawaii Revised Statutes (HRS) Chapter 587.[8] The DHS sought, among other things, an order "awarding permanent custody to an appropriate authorized agency, which permanent custody order will terminate parental and custodial duties and rights," and establishing a permanent plan for Child. On December 22, 2009, the DHS filed a certificate of service which certified that the DHS's Permanent Custody Motion was served upon Mother's attorney by U.S. mail on December 16, 2009.

Mother did not appear at the December 22, 2009, hearing. This was the first hearing in this case for which Mother failed to appear as required. The DHS requested that Mother be defaulted and that the family court grant the DHS's Permanent Custody Motion and order the proposed permanent plan. In response, Mother's counsel, who was present at the hearing, stated: "I don't know where [Mother] is. She's usually here early. She's been coming to every hearing. I did not get the [Permanent Custody Motion], so I did not send that to her." The family court granted the DHS's requests.

On December 22, 2009, the family court issued its "Order Awarding Permanent Custody," which found Mother "to be in default" for failing to appear at the hearing after being duly served and previously ordered to appear. The family court granted the DHS's Permanent Custody Motion, and it ordered that Mother's "parental and custodial duties and rights" over Child "are hereby divested pursuant to HRS 587–2 and 587–73" and that the Director of the DHS "is appointed permanent custodian" of Child.

On January 7, 2010, Mother filed a motion to set aside the default entered against her. In support of this motion, Mother's counsel filed a declaration which represented, among other things, that: (1) as counsel informed the family court at the December 22, 2009, hearing, counsel had not received a copy of the DHS's Permanent Custody Motion and "hence did not mail one to [Mother]"; (2) "it was not certain" that the DHS would file a Permanent Custody Motion by the scheduled December 22, 2009, hearing; (3) Mother explained to counsel that Mother "had been so distraught over DHS' decision to terminate her rights[9] in spite of the fact that she has been participating in services, that she had not paid attention to the next review hearing date"; and (4) Mother was in a session with her therapist on the day of the December 22, 2009, hearing.

On February 11, 2010, Mother and her counsel appeared at the scheduled hearing on Mother's motion to set aside the default, and Mother's counsel stood on the written motion. The family court orally denied Mother's motion at the hearing and filed a written order of its ruling that same day. On March 25, 2010, the family court issued written "Findings of Fact and Conclusions of Law." On April 6, 2010, the family court filed an

---

7. It appears that "MPC" was intended as an acronym for "motion for permanent custody."

8. Effective September 1, 2010, the 2010 Legislature, through Act 135, repealed HRS Chapter 587 and reenacted the CPA with amendments to be codified as a new HRS Chapter. 2010 Haw. Sess. Laws Act 135. In analyzing this case, we apply the relevant provisions of HRS Chapter

587 because the family court's rulings challenged on appeal were issued before the effective date of Act 135.

9. This presumably is a reference to the DHS's statement at the November 17, 2009, hearing of its intention to file a motion for permanent custody.

"Amended Order Awarding Permanent Custody." The amended order was the same as the original Order Awarding Permanent Custody except that it added a provision stating that "[Mother is] defaulted for failure to appear and notice of future hearings is waived[.]" Mother timely filed an amended Notice of Appeal.

## II. DISCUSSION

On appeal, Mother seeks review of the following family court orders: (1) the December 22, 2009, "Order Awarding Permanent Custody"; (2) the February 11, 2010, "Order[ ] Concerning Child Protective Act," which denied Mother's motion to set aside default; and (3) the April 6, 2010, "Amended Order Awarding Permanent Custody." Mother argues that the family court abused its discretion and violated her due process rights by granting the DHS's Permanent Custody Motion based on the family court's entry of default against Mother and by denying Mother's motion to set aside the default. Mother also challenges the family court's findings of fact and conclusion of law related to its determination that Mother was an unfit parent, i.e., that Mother was not willing and able, and it was not reasonably foreseeable that Mother would become willing and able within a reasonable period of time, to provide Child with a safe family home. These challenged findings of fact and conclusions of law were issued in support of the family court's granting of the DHS's Permanent Custody Motion.

The dispositive issue in this appeal is whether the family court abused its discretion in entering default against Mother, resulting in its granting of the DHS's Permanent Custody Motion, based on Mother's single non-appearance at the December 22, 2009, hearing. For the reasons discussed below, we conclude that the family court abused its discretion in entering default against Mother under the circumstances of this case. We vacate the family court orders challenged by Mother on appeal, and we remand the case for further proceedings.

### A.

The sanction of a default or default judgment "is a harsh one." *Rearden Family Trust v. Wisenbaker*, 101 Hawai'i 237, 254, 65 P.3d 1029, 1046 (2003). "Generally, [defaults and] default judgments are not favored because they do not afford parties an opportunity to litigate claims or defenses on the merits." *In re Genesys Data Technologies, Inc.*, 95 Hawai'i 33, 40, 18 P.3d 895, 902 (2001). "[A]ny doubt should be resolved in favor of the party [opposing the default or default judgment], so that, in the interests of justice, there can be a full trial on the merits." *Rearden Family Trust*, 101 Hawai'i at 254, 65 P.3d at 1046.

In this case, the family court sanctioned Mother for her failure to appear at the December 22, 2009, hearing, by finding her to be in default and granting the DHS's Permanent Custody Motion. We review the family court's imposition of this sanction for abuse of discretion. *See id.*

The propriety of a trial court's imposition of sanctions has been analyzed in the analogous context of sanctions imposed for violation of discovery obligations and pretrial deadlines. In construing Hawai'i Rules of Civil Procedure (HRCP) Rule 37, which authorizes a trial court to impose sanctions for discovery violations, we noted that under the parallel federal rule, the "drastic sanctions of dismissal and default judgment are authorized only in extreme circumstances." *W.H. Shipman, Ltd. v. Hawaiian Holiday Macadamia Nut Co.*, 8 Haw.App. 354, 361, 802 P.2d 1203, 1207 (1990) (internal quotation marks and citation omitted).

In *Long v. Long*, 101 Hawai'i 400, 69 P.3d 528 (App.2003), we quoted the following passage on the trial court's authority to dismiss actions or grant judgments of default as sanctions for discovery violations:

> In view of the strong policy favoring resolution of cases on their merits, and since the magnitude of due process concerns grows with the severity of the sanction, courts uniformly have held that *orders dismissing the action or granting judgments on default as sanctions for violating discovery orders are generally deemed appropriate only as a last resort,*

*or when less drastic sanctions would not ensure compliance with a court's orders.* It follows then that a trial court's range of discretion is appreciably narrower if it chooses to impose these most [severe of] sanctions.

*Id.* at 405–06, 69 P.3d at 533–34 (brackets in original omitted; emphasis added) (quoting 7 J. Moore, Moore's Federal Practice § 37.50[2][a] at 37–77–78 (3d ed.2002)).

■ We consider the following five factors in reviewing whether a trial court's dismissal of a claim or entry of default judgment as a discovery sanction constitutes an abuse of discretion: "(1) the public's interest in the expeditious resolution of litigation; (2) the court's need to manage its docket; (3) the risk of prejudice to the party moving for sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions." *Weinberg v. Dickson–Weinberg,* 123 Hawai'i 68, 71, 229 P.3d 1133, 1136 (2010); *W.H. Shipman,* 8 Haw.App. at 362, 802 P.2d at 1207. *Weinberg* was a divorce case involving disputes over property division and alimony in which the sanction imposed by the family court for the wife's failure to meet pretrial deadlines was tantamount to the entry of a default against the wife. *Weinberg,* 123 Hawai'i at 76, 229 P.3d at 1141. The Hawai'i Supreme Court agreed with this court that "the sanction chosen must be commensurate with the offense" and that a sanction which is tantamount to the entry of default "should be supported by evidence of willful or contemptuous or otherwise opprobrious behavior." *Weinberg,* 123 Hawai'i at 77, 229 P.3d at 1142.

### B.

■ These principles for reviewing a trial court's decision to impose dismissal or default as a sanction for discovery violations apply to civil cases and divorce actions involving disputes over money and property. Concerns over the harshness of the severe sanction of default, which deprives a party of the opportunity to litigate disputed issues on the merits, are heightened in a case like this one where a mother's parental rights regarding her child are at stake.

The United States Supreme Court has stated that it is "plain beyond the need for multiple citation that a natural parent's desire for and right to the companionship, care, custody, and management of his or her children is an interest far more precious than any property right" and constitutes a "fundamental liberty interest." *Santosky v. Kramer,* 455 U.S. 745, 758–59, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (internal quotation marks and citation omitted). "The rights to conceive and to raise one's children have been deemed essential [and] basic civil rights of man . . . ." *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (internal quotation marks and citation omitted). The United States Supreme Court has further observed that "parental termination decrees are among the most severe forms of state action," *M.L.B. v. S.L.J.,* 519 U.S. 102, 128, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996), and that "[a] parent's interest in the accuracy and justice of the decision to terminate his or her parental status is . . . a commanding one." *Lassiter v. Department of Social Services,* 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981).

Similarly, the Hawai'i Supreme Court has "affirm[ed], independent of the federal constitution, that parents have a substantive liberty interest in the care, custody, and control of their children protected by the due process clause of article [I], section 5 of the Hawai'i Constitution." *In re Doe,* 99 Hawai'i at 533, 57 P.3d at 458. The Hawai'i Supreme Court further stated:

Parental rights guaranteed under the Hawai'i Constitution would mean little if parents were deprived of the custody of their children without a fair hearing. Indeed, parents have a fundamental liberty interest in the care, custody, and management of their children and the state may not deprive a person of his or her liberty interest without providing a fair procedure for the deprivation. Furthermore, the [United States] Supreme Court has said that parental rights cannot be denied without an opportunity for them to be heard at a *meaningful time and in a meaningful manner.*

474

*Id.* (brackets in original, internal quotation marks, and citations omitted).

C.

■ Here, Mother appeared with counsel at the first hearing set in this case on the DHS's Petition for Temporary Foster Custody and at every hearing at which Mother's attendance was required for the next eighteen months. At the initial hearing held on May 16, 2008, Mother contested the Petition for Temporary Foster Custody. Mother then appeared at the trial on the Petition for Temporary Foster Custody. After the family court ruled against Mother on the petition and ordered a service plan, Mother appeared at all four of the ensuing review hearings on November 12, 2008, March 19, 2009, June 9, 2009, and November 17, 2009. During this period, Mother actively engaged in services required by the service plan and attended scheduled visitations with Child. By her actions and conduct, Mother displayed a strong and sustained interest in participating in the family court proceedings affecting her parental rights over Child and in securing reunification with Child.

The family court defaulted Mother and granted the DHS's Permanent Custody Motion, which divested Mother of her parental rights over Child, as a sanction for Mother's non-appearance at the December 22, 2009, hearing—Mother's first and only failure to appear at a hearing in this case. Both the DHS and Mother agree that the December 22, 2009, hearing was not set as a date for trial on the merits of the DHS's Permanent Custody Motion. Instead, the December 22, 2009, hearing was intended to be a "return" or trial-setting hearing, where the family court would determine whether Mother wanted to contest the DHS's Permanent Custody Motion, and if she did, the family court would set pretrial deadlines and the date for trial. Indeed, on November 17, 2009, when the family court set the December 22, 2009, hearing, the DHS had not yet filed its Permanent Custody Motion, and the

DHS only did so on December 16, 2009, six days before the scheduled hearing. Nothing in the record suggests that a short continuance of the hearing to permit Mother's counsel to determine Mother's whereabouts and secure Mother's attendance would have resulted in any substantial prejudice to the DHS or Child. Nor does it appear that a short continuance would have unduly infringed upon the family court's need to manage its docket.

Under the circumstances of this case, we conclude that the family court abused its discretion in imposing the harsh and drastic sanction of default against Mother based upon her single non-appearance. The effect of the default sanction was to divest Mother of her parental rights—her fundamental liberty interest in the care, custody, and control of her child—without affording Mother the opportunity to contest the DHS's Permanent Custody Motion on the merits. The record does not show that Mother's single non-appearance constituted willful or contemptuous or otherwise opprobrious behavior on Mother's part or that the family court considered the availability of less drastic sanctions.

■ "[T]he sanction chosen must be commensurate with the offense...." *Weinberg*, 123 Hawai'i at 77, 229 P.3d at 1142. Given the essential and fundamental nature of Mother's parental rights at stake; the strong and sustained interest she demonstrated in the family court proceedings in this case and in obtaining reunification with Child, including her perfect attendance at family court hearings for the first eighteen months; and the procedural, trial-setting character of the December 22, 2009, hearing, we conclude that the default sanction imposed by the family court was decidedly and manifestly disproportionate to Mother's isolated transgression. Indeed, the DHS does not cite to any published opinion that upheld the entry of default and divestiture of a parent's rights under circumstances similar to this case.[10]

10. In her appellate briefs, Mother did not cite Hawaii Revised Statutes (HRS) § 571–61(b)(3) (2007) in support of her appeal. HRS § 571–61(b)(1)(E) (2007), in general terms, authorizes the family court to terminate the parental rights of a parent who is found to be unable to provide the care necessary for the well-being of a child. HRS § 571–61(b)(3), in turn, provides that in respect to proceedings, including those under HRS § 571–61(b)(1)(E), the family court may

### D.

Our conclusion that the family court abused its discretion in defaulting Mother in the first instance obviates the need to address whether the family court erred in denying Mother's motion to set aside the default. *See Long*, 101 Hawai'i at 407, 69 P.3d at 535. As the result of its imposition of the default sanction, the family court granted the DHS's Permanent Custody Motion and divested Mother of her parental rights without giving Mother an opportunity to challenge the DHS's motion or the evidence proffered in support of the motion. Therefore, our conclusion that the family court erred in imposing the default sanction means that we must vacate the family court's Order Awarding Permanent Custody, its Amended Order Awarding Permanent Custody, and its findings of fact and conclusions of law that were based on evidence which Mother did not have the opportunity to challenge. On remand, Mother will have the opportunity to contest the DHS's Permanent Custody Motion on the merits. We express no view on what the outcome of the family court's decision on the merits of that motion should be.

### III. CONCLUSION

We vacate the family court's: (1) December 22, 2009, "Order Awarding Permanent Custody"; (2) February 11, 2010, "Order[ ] Concerning Child Protective Act," which denied Mother's motion to set aside default; and (3) April 6, 2010, "Amended Order Awarding Permanent Custody," and we remand the case for further proceedings consistent with this opinion.

---

exercise its authority to terminate parental rights only when a verified petition has been filed by a responsible adult on behalf of the child and the court has a hearing on the petition. HRS § 571–61(b)(3) further provides:

> A copy of the petition, together with notice of the time and place of the hearing thereof, shall be personally served at least twenty days prior to the hearing upon the parent whose rights are sought to be terminated. If personal service cannot be effected within the State, service of the notice may be made as provided in section 634–23 or 634–24.

We requested that the parties be prepared at oral argument to address the extent to which HRS § 571–61(b)(3) applies to this case. At oral argument, Mother's counsel argued that HRS § 571–61(b)(3) appears to apply to this case and that Mother was not personally served with the Permanent Custody Motion twenty days before the hearing. Mother's counsel acknowledged, however, that in his experience, the requirements of HRS § 571–61(b)(3) are not referred to in termination of parental rights cases brought under the CPA, HRS Chapter 587.

Counsel for the DHS argued that the service requirements of HRS § 571–61(b)(3) do not apply to termination of parental rights cases brought under the CPA. The DHS's counsel noted that the version of the CPA applicable to this case had its own service provision, HRS § 587–51.5 (2007), which counsel asserted only required that notice of a hearing be served forty-eight hours before the scheduled hearing. The DHS's counsel further asserted that amendments to the CPA after its original enactment reflect the Legislature's intent that the service requirements of HRS § 571–61(b)(3) do not apply to termination of parental rights cases brought under the CPA.

In light of our resolution of this appeal, we need not address the applicability of HRS § 571–61(b)(3).